# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

          **v.**

**RODERICK MOORE,**

      **Defendant.**

**Case No. 1:23-cr-47**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Defendant Roderick Moore's trial begins on October 15, 2024. But in one of Moore's pretrial motions, he challenges whether one of the government's proposed expert witnesses may testify at the trial. The Court has described the facts of this case in various other recent Opinions and Orders, so an in-depth retelling is not needed here. Two details set the stage. First, a grand jury indicted Moore on two counts of possession with intent to distribute and attempt to distribute controlled substances, two counts of possession of a firearm in furtherance of drug trafficking offenses, and two counts of possession of a firearm by a prohibited person. (Doc. 1). Second, Moore moved the Court for a *Daubert* hearing regarding the government's proposed palm-print expert witness. (Doc. 338).[1] This proposed expert witness—Officer Kimberly Horning—intends to testify regarding an analysis she conducted of a palm print she created from a digital photograph of a hand holding what appears

---

[1] After initially moving the Court for this *Daubert* hearing, Moore continued to ask the Court to hold such a hearing in many of his subsequent filings. This Opinion and Order addresses only Moore's original motion, but in granting the hearing and resolving this dispute, the Court is responding to all of Moore's subsequent requests on this topic, as well.

to be a bag of drugs that police located on one of Moore's cellphones. According to Horning, she compared that palm print to a known Moore palm print, and the two match. The government says it intends to use this identification, coupled with the contents of the photograph, to show Moore's intent to distribute and to prove Moore had control over the substances the government found during the search of an apartment the government contends is associated with Moore. Moore not only questions the palm-print matching techniques Horning employed, but also notes that the photograph was taken over a year before the charged conduct. So he argues that even if the hand were his, the photograph is inadmissible prior bad acts evidence.

In the Court's view, during the recent *Daubert* hearing, the government made the necessary showing that its witness "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). So the Court will not exclude her on reliability grounds. However, the Court reserves ruling on Moore's objections to the admissibility of the underlying photograph until trial. As a result, the Court **GRANTS IN PART** Moore's motion, (Doc. 338), (to the extent he sought a *Daubert* hearing), **DENIES** it **IN PART** (as to the request to preclude Horning on reliability grounds), and **HOLDS** it **IN ABEYANCE IN PART** (on the Federal Rules of Evidence 403 and 404 issues).

## BACKGROUND

Moore moved the Court on August 28, 2024, for a *Daubert* hearing on Officer Kimberly Horning. (Doc. 338). Moore said that the "credentials proffered by the Government do not portray her to be certified in any study or science involving

photograph identification." (*Id.* at #1838). Moreover, Moore alleged that "[t]he scientific process or test procedure regarding this evidence is unknown." (*Id.*). Finally, Moore protested that Horning had "proffered 2 different results" and that "[t]he Government only submitted 1 exhibit to accompany its motion."[2] (*Id.*).

Horning is an "officer and fingerprint evidence analyst with the Cincinnati Police Department." (Doc. 356, #1938). The government says that at trial, Officer Horning "will testify that she reviewed a photograph recovered from the defendant's cellular phone of a hand holding what appears to be a bag of methamphetamine and compared it with a known palm print of [Moore]"—i.e., that the hand is Moore's. (*Id.*). The government avers that "Officer Horning's opinions are based on her education and experience as a fingerprint analyst and on her report of the known palm print and the photograph recovered from the defendant's phone." (*Id.*).

Based on Horning's curriculum vitae, her relevant qualifications in this instance include her over-a-decade of experience as a "Criminalist" in the Cincinnati Police Department—which purportedly includes responsibilities like "develop[ing] and preserv[ing] latent fingerprint evidence" and "examin[ing], evaluat[ing] and

---

[2] Moore also alleges that "[t]he Government *knowingly* submitted the wrong result, or the first result which was known to be in error." (Doc. 338, #1838 (emphasis added)). In what has become a running theme in this case, Moore does not substantiate this claim of intentional wrongdoing on the government's part. He simply speculates that the government intentionally erred. Here, for example, the government failed to attach the palm-print report it intends to use at trial. It instead mistakenly attached two copies of an earlier errant report to its filing. (*See* Doc. 209, #1189–90). Because the differences between the two are slight at first blush it is quite possible that the government *accidentally* attached the same report twice. So while the Court understands Moore's concern about the mistake, it declines to find the government knowingly made it. At the same time, the Court encourages the United States to double-check future filings, and to promptly correct such filings when it learns of any deficiencies, such as through Moore's motion here.

identify[ing] latent fingerprint evidence"—and the completion of several professional trainings related to fingerprint and palm-print analysis. (Doc. 209-12, #1191, 1192–96). These trainings included "Essential Ridgeology Concept"—a 40-hour, multi-day training "covering the science of friction ridge, ACE-V, and relevant caselaw"—as well as "Latent Palm Comparison"—a 24-hour, multi-day training on "pattern recognition" and "determining friction ridge location." (*Id.* at #1193, 1196).

Beyond Officer Horning's qualifications, also central to this dispute are Officer Horning's initial and subsequent palm-print analysis reports. Her initial report, filed May 19, 2022, notes that police officer "Connley submitted a photograph of a hand holding a clear bag of crystal-like substance." (Doc. 209-11, #1189). The principal dispute relates to the "Results of Examination" section, so the Court quotes it here in full:

> "On 5/19/22, PO Connley submitted a photograph of a hand holding a clear bag of crystal-like substance. Roderick Moore … was submitted as the possible suspect.
>
> When viewing this photograph, *it appears to be the left hand. However, after comparing Mr. Moore's left hand to the photograph, it was not his hand*. Operating under the possibility that the image was taken with the front facing cell phone camera, or otherwise placed in 'selfie mode', which inherently flips images horizontally, *the image was compared to Roderick Moore's right hand*.
>
> *The photo of the hand was identified to Roderick Moore's right hand*."

(*Id.* (emphases added)). In short, the report concludes that the palm depicted in the photo matches Moore's right palm. This identification was then "verified by Criminalist Werling." (*Id.*). This was the only Horning Report that the government had provided to the Court when Moore requested a *Daubert* hearing.

As a general matter, the Court need not hold a *Daubert* hearing just because a party seeks to proffer an expert witness. *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 854 (E.D. Ky. 2013). But if "the record is inadequate to decide the motion," the Court is required to do so. *Id.* And at that hearing, it must assess the evidence under the standard *Daubert* sets forth to evaluate both the scientific reliability of the methodology employed and the relevance of the evidence to be proffered at trial. *Id.*; *accord United States v. Smithers*, 212 F.3d 306, 314–16 (6th Cir. 2000). If the jury can draw their own inferences about the evidence presented—that is if it's something the everyday person could analyze—expert testimony is inadmissible as it would not help or assist the jury. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021).

In light of Moore's request for a *Daubert* hearing, the Court reviewed the government's initial disclosure regarding the substance of Officer Horning's opinions. Based on that review, the Court determined that it lacked a sufficient basis to assess either the reliability or the relevance of her intended testimony. Her initial report— again, the only report on the record before the *Daubert* hearing—states that she compared the image of a hand to a known palm print from Moore but contains no details about how she conducted that comparison. (Doc. 209-11, #1189). And to the extent Horning's report can be read to put forward a methodology, it simply states that she looked at the image, essentially guessed about how it was taken (whether using the front-facing or rear-facing camera), and then deduced that the image depicted Moore's hand based on a comparison. (*Id.*). This vague description raised

5

significant red flags. First, as a general matter, a mere visual comparison—if that was the basis for her testimony—is typically not fodder for expert evidence. Nor, on a related front, did the government acknowledge or explain the difference (or similarity) between fingerprint analysis and palm-print analysis in its response, leaving the Court uncertain as to how, or even whether, Officer Horning's background in fingerprint analysis would carry over to palm prints. (*See* Doc. 356, #1938–40 (explaining only that Horning is "an expert in fingerprint identification and analysis" and that appeals courts have "repeatedly confirmed the reliability of fingerprint evidence"—but saying nary a word about palm-print evidence)).

That said, the Court realized that it was possible that Officer Horning had conducted a more granular, methodical review of the palm prints in ways requiring specialized knowledge for which expert evidence is warranted, and that her fingerprint training included training in palm prints. So, the Court set a *Daubert* hearing for September 25, 2024, to collect additional information. (9/20/24 Not. of Hr'g).

At that hearing, Officer Horning testified and explained her methodology in greater detail (which the Court will discuss shortly). But perhaps as important as the methodology,[3] the government presented a second, updated report that Moore referenced in his motion, and that the government had acknowledged,[4] but that it

---

[3] It is as important because Federal Rule of Evidence 702 requires not only a reliable method, but reliable application of the method. Fed. R. Evid. 702(d).

[4] "The United States acknowledges that Officer Horning made two reports, the first on May 20, 2022, and the second to supplement the first report on July 27, 2022. Both have been provided to the defendant. There is a difference in her finding as to which of the defendant's

had not previously presented to the Court. (Doc. 338, #1838–39). Before delving into Officer Horning's testimony at the hearing, the Court quotes the "Results of Examination" section from the updated report completed July 27, 2022:

> "On 5/19/22, PO Connley submitted a photograph of a hand holding a clear bag of crystal-like substance. Roderick Moore … was submitted as the possible suspect.
>
> When viewing this photograph, *it appears to be the left hand*. In order to do a side-by-side comparison, the image has to be flipped, as it's essentially a mirror image of what the print would be, when viewing the inked impression. The image was then converted into black and white and inverted to account for the light ridges and dark furrows.
>
> *The photo of the hand was identified to Roderick Moore's left hand*."

(Daubert Hr'g Government Ex. Daubert 5 (emphases added)).

The difference between the two reports is obvious and stark. In the first, the report listed the palm-print analysis as resulting in a match of Moore's *right* hand. (Doc. 209-11, #1189). Lest there be any doubt, that first report also explicitly stated that it was *not* his left hand. (*See id.* ("[A]fter comparing Mr. Moore's left hand to the photograph, it was not his hand.")). But in the second report, it is now Moore's *left* hand that Horning claims matches—the same hand she had ruled out in the first report. Unhelpfully, the second report offers no explanation for the change.

What gives? During the *Daubert* hearing, Officer Horning testified that either when she was preparing for Moore's trial or preparing to hand off materials to another officer (she was not clear on which), she reviewed her work and realized a substantial error—in transcribing her report, she had mixed up the hands. She

---

hands is holding the baggie of drugs, but not the ultimate conclusion that the defendant's hand is the one in the photo taken from one of the defendant's phones at the time of his arrest." (Doc. 356, #1939–40).

7

explained the error as follows. During her first analysis she took the known palm print of Moore's left hand and flipped it to match the orientation of the image provided to her (with palm facing up). So, as depicted on her screen, the image of the known left-hand print appeared to be a right-hand print.[5] She says she should have flipped the image provided to her to match the orientation of the known print instead. When she wrote her report, she says that because of how she flipped and oriented the images, she mistakenly inverted her rights and lefts on the report. So she wrongly claimed both that the print did not match the left hand (which was really the known print of the right hand) and did match the right hand (which was really the known print of the left hand). As for the additions to and subtractions from the explanations in the two reports, Officer Horning assures the Court that she reexamined her analysis in order to verify her mistake, but did not change the inputs or start from scratch. Instead, she insists that she added a corrected explanation and provided details about the flipping and mirroring of the image to explain her original left-right mistake.

While the Court was initially skeptical, and while there are substantial changes between the text of the results sections of the two reports, after Officer Horning explained several of the exhibits the government provided at the *Daubert* hearing, the Court understands how Officer Horning plausibly could have made the mistake she claims occurred. Of course, the Court also acknowledges Moore's frustration with the stark difference between the reports. Nonetheless, the Court

---

[5] When fingerprints and palm prints are inked or scanned, the hand is placed down on a surface, and the associated image then appears to be oriented like the opposite hand.

concludes that Officer Horning identified a match between the palm in a photo extracted from one of Moore's cellphones and Moore's known *left*-hand palm print, and simply misreported that result.

So with that bit of background out of the way, let's turn to the methodology Officer Horning used to make that identification and her qualifications to do so—the typical grist of a *Daubert* hearing. In addition to the information provided in her curriculum vitae, Horning testified at the hearing that she has analyzed thousands of palm prints. She also explained the steps involved in conducting palm-print analysis based on palms depicted in photographs: (1) analyze whether the photograph contains the necessary level of detail to allow for a comparison (e.g., the presence of visible ridges and bifurcations in ridge lines); (2) enhance the image using Photoshop (e.g., converting to black and white and then inverting the colors) to make such details standout; (3) mark first-level points of identification (e.g., ridge patterns), second-level points (e.g., ridge endings and bifurcations), third-level points (e.g., pores and creases); and (4) compare those points of identification with the same area of the known palm print. Officer Horning testified that palm prints are unique to individuals, such that if the identification points match, the two prints are from the same person. She further testified that this process is a product of her training, and that courts around the country have accepted the process. She used this process in conducting her analysis for this case. She also stated that studies show the error rate

for misidentifications is somewhere between 0.001–0.003%.[6] Finally, regarding any potential differences between fingerprint and palm-print analyses, Officer Horning testified to the effect that these are similar processes, with marginal differences. Palm-print analysis appears to have distinct areas of focus, like the attention given to areas Officer Horning referred to as "deltas." But the same loops, whirls, arches, and patterns that experts analyze on fingerprints are also present in palm-print analysis.

After considering Officer Horning's testimony regarding her methodology and reviewing her credentials along with the reports the government provided, the Court now turns to whether it should allow her to provide expert testimony at trial under *Daubert* and Federal Rule of Evidence 702.

## LAW AND ANALYSIS

District courts are responsible for "acting as gatekeepers to exclude unreliable expert testimony." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Federal Rule of Evidence 702 permits only those witnesses who are "qualified as an expert by knowledge, skill, experience, training, or education" to offer an expert opinion. And that rule "applies not only to testimony based on 'scientific' knowledge,

---

[6] While the Court finds this purported error rate to be fantastical (in the imaginative sense, not the terrific), it takes some comfort that the Sixth Circuit has previously addressed exaggerated error-rate claims for print technology. *See United States v. Watkins*, 450 F. App'x 512, 516 (6th Cir. 2011) ("[W]e decline to hold that her allegedly mistaken error-rate testimony negates the scientific validity of the ACE–V method given all the other factors that the district court was required to consider."). Further, peer-reviewed literature in the field suggests the error rate is less than 1%. *See* Heidi Eldridge et al., *Testing the Accuracy and Reliability of Palmar Friction Ridge Comparisons – A Black Box Study*, 318 Forensic Sci. Int'l 110457 (Jan. 2021), https://www.sciencedirect.com/science/article/pii/S0379073820303194 [https://perma.cc/7JQ5-UKCJ].

but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Beyond the expert's qualifications, there are two other hurdles the expert's proposed testimony must clear before a court allows it. First, the proposed testimony must assist the trier of fact in understanding evidence or determining a fact in issue. *In re Scrap Metal*, 527 F.3d at 529. Second, it must be reliable. *Id.*

When evaluating the reliability of proposed expert testimony, "Rule 702 grants the district judge [] discretionary authority." *Kumho Tire*, 526 U.S. at 158. Nonetheless, both Rule 702 and *Daubert* provide guidance on that topic to trial courts. Rule 702 includes some standards—that the testimony "is based on sufficient facts or data," "is the product of reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). And *Daubert* provides a non-exclusive list of factors that courts may consider in assessing reliability. *Kumho Tire*, 526 U.S. at 149–50. These include whether the expert's method has been tested, "subjected to peer review and publication," assigned an error rate, constrained by "the existence and maintenance of standards controlling the technique's operation," or has garnered "general acceptance" in the applicable expert community. *Daubert*, 509 U.S. at 593–94. These are all considerations to weigh when evaluating a proposed expert's testimony. Relying on those considerations, the Court now turns to whether Officer Horning's proposed palm-print testimony passes the test.

A.   **The Government's Palm-Print Examiner May Testify as an Expert at Trial under *Daubert* (If the Underlying Photograph Is Admissible).**

Courts have overwhelmingly accepted the reliability of fingerprint and palm-print experts post-*Daubert*. *See United States v. Watkins*, 450 F. App'x 511, 515–16 (6th Cir. 2011) (approving of the district court's crediting of the ACE-V method of fingerprint analysis under *Daubert*); *United States v. Crisp*, 324 F.3d 261, 266, 268 (4th Cir. 2003) (stressing the longstanding use of fingerprint identification in criminal trials and commenting that "[w]hile the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well"); *State v. Favela*, 323 P.3d 716, 718 (Ct. App. 2014) (collecting cases). Focusing specifically on palm-print analysis, and after an in-depth assessment of the predominant method employed by palm-print experts,[7] one court found that it "is sufficiently reliable to permit a jury to hear testimony on it." *United States v. Council*, 777 F. Supp. 2d 1006, 1011 (E.D. Va. 2011).

_____

[7] Again, the method evaluated in that case was the ACE-V method, which the court found had near-consensus as an accepted method in the expert community. *Council*, 777 F. Supp. 2d at 1011. The other reasons that court found the ACE-V palm-print analysis method reliable under *Daubert* were that (1) there are "widely recognized standards" among friction ridge examiners in that they "agree on the types of characteristics relevant to distinguishing one print from all others, including bifurcations, ending ridges, and ridge dots"; (2) "[a] fundamental tenet of ACE-V is that, if a latent and a known print do not share on such characteristic at the identical location in the target area, then the examiner should unequivocally exclude the latent print as a match"; and, (3) while there is not peer review per se, the blind verification that the ACE-V methodology requires "aim[s] to achieve independent, unvarnished oversight of an initial practitioner's analysis." *Id.* at 1011–12. The opinion also comprehensively detailed the stages of ACE-V technique along with details. *See id.* at 1008–09 (identifying four such stages that make up the acronym—analysis, comparison, evaluation, and verification).

Because, as discussed below, Officer Horning's qualifications show she has received adequate training and her testimony strongly suggests that she followed the predominantly used palm-print methodology to conduct her analysis in this case, the Court sees no reason to depart from the longstanding position that palm-print evidence of the type she intends to present here passes muster under *Daubert*.

### 1. Whether Horning's Knowledge, Skill, Experience, Training, or Education Qualify Her as an Expert.

Officer Horning has the requisite experience and training to qualify her as an expert in palm-print analysis. This follows for three primary reasons. First, Horning is trained in the predominant palm-print analysis methodology—ACE-V—and has attended multiple friction ridge and latent print examination trainings over the last decade. (*See* Doc. 209-12, #1192–96). Second, she has worked in her role since November 2013, (*id.* at #1991), and has analyzed thousands of palm prints during that time according to her testimony. Third, the methodology Officer Horning described in her testimony at the *Daubert* hearing closely resembles the ACE-V method described (and accepted) in other palm-print cases. For example, Horning discussed the classic hallmarks—ridge patterns, ridge endings, bifurcations—that other cases have discussed. True, Officer Horning did not use the exact same terminology to describe the various stages of her analysis that the print expert did in *Council*, nor did she use the phrase ACE-V. But the Court has no reason to believe that the precise terminology used to describe the stages in *Council* are required standard practices, nor did Moore offer any cross-examination that attacked Horning's general methodology, or that suggested she did not use ACE-V.

13

In fairness to Moore, he does argue that "[t]he scientific process or test procedure regarding this evidence is unknown." (Doc. 338, #1838). But, as explained above, that is simply not true. And, while Moore may have a point that fingerprinting is not "scientific," Rule 702 applies to scientific, technical, and specialized knowledge all the same. Fed. R. Evid. 702(a).

Turning to the specific examination here, which involved Horning generating a palm print from a photograph, Moore also contends that Horning is not "certified in any study or science involving photograph identification." (Doc. 338, #1838). At the *Daubert* hearing, he specifically focused on her use of Photoshop to generate the photograph-based palm print and whether using the software application in that manner was a valid and accepted practice in her field. But Horning, while admitting she is not a Photoshop expert,[8] averred that it is common practice among the fingerprint and palm-print analyst community to use Photoshop to capture and enhance the ridge details in a photograph by the accepted steps of subtracting the color, inverting black and white, and enhancing contrast. So Moore may be correct that Horning is not a "photograph identification" expert, or a Photoshop expert, but what matters here is her expertise with regard to palm-prints—or in other words, whether she has the requisite training and experience to process photographs of palms to generate an output that can reliably be compared with known palm prints. The Court finds that she has that training and experience.

---

[8] Horning has, however, received training to use Photoshop for latent print examination "to enhance latent prints." (Doc. 209-12, #1192).

Beyond that, Moore principally focused his cross-examination on attempting to clarify certain terminology and scrutinizing the differences between Horning's original report and amended report. Neither line of examination resulted in testimony that convinces the Court that Horning is unqualified. It is true that parts of Horning's testimony could have been better. For example, it would have been helpful had the photographic exhibits Horning used had a sufficient level of clarity to allow the Court to confirm the matching exercise she says she performed. Likewise, the Court would have preferred Horning to recite the technical name of her methodology (instead she simply testified that she followed the generally accepted practice in the field). And Horning preferably would have come prepared to succinctly and intuitively explain the difference between the results of her initial report and her amended report. But by the end of the hearing, the Court was confident that it understood why Horning made the mistake and how an expert in the same situation might do the same. Beyond that, regardless of the hands Horning thought she was comparing, the Court ultimately was convinced she plotted enough common characteristics between (1) the palm in the photograph, and (2) the known palm print, to identify a match to Moore.

Perhaps the only thing that continued to give the Court pause was Horning's inability to cite studies supporting her (likely exaggerated) error-rate estimates during the hearing. But the essence of Horning's error-rate testimony was that false-positive identifications are exceedingly rare—less than 1%—and that appears to be true. *See supra* n.6.

In short, while the government's expert could have testified more clearly, she still meets the qualification prong of the Rule 702 analysis.

### 2. Whether Horning's Proposed Testimony Will Assist the Jury.

"Rule 702 requires that the expert's testimony must assist the trier of fact. This requires that the scientific evidence must 'fit' the facts of the case." *United States v. Pollard*, 128 F. Supp. 2d 1104, 1119 (E.D. Tenn. 2001). If the photograph from Moore's cellphone is admissible for a proper purpose (more on that below), Officer Horning's proposed testimony would undoubtedly assist the jury. *Cf. United States v. Jemison*, 310 F. App'x 866, 875 (6th Cir. 2009) (citations omitted) (explaining that the Sixth Circuit has "consistently 'found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror'"). Palm-print identification is not in the wheelhouse of a typical juror. In other words, when presented with the photograph at issue, jurors could only guess at the identity of the person whose palm is pictured. Officer Horning brings expertise and technical knowledge to bear on that question.

Moore objects that this testimony would not assist the jury in deciding this case and that it would confuse the jury. While Moore's objections to the photograph's admissibility may have merit, his objections here do not. If the photograph is admissible—that is, if it is relevant, and its probative value is not substantially outweighed by the danger of unfair prejudice it presents—then Officer Horning's proposed testimony is largely what gives the photograph its significance. Indeed, without her testimony, jurors would be more confused when presented with the

16

photograph. So, Officer Horning's proposed testimony would assist the jury in understanding the photograph and, accordingly, passes this requirement.

### 3.     Whether Horning's Proposed Testimony Is Reliable

That leaves the question of whether palm-print analysis, the method to which Horning intends to testify, is a sufficiently reliable technique under Rule 702. Furthermore, recall that the method must both be reliable from a general or theory standpoint, and also reliably applied in the context of the instant case.

Start with the first one. As noted above, plenty of courts have examined the ACE-V method and held that it is sufficiently reliable. *See e.g.*, *Watkins*, 450 App'x at 515–16 (affirming the district court's finding that the ACE-V method was scientifically valid). This Court has no reason to go against the weight of caselaw and binding authority.

But that is not the end of the inquiry. The Court must also determine whether Officer Horning reliably *applied* the ACE-V method here. Fed. R. Evid. 702(d). The Court concludes she did. Horning testified at the *Daubert* hearing that, in conducting her analysis for this case, she followed her training and the generally accepted method in her field. Her curriculum vitae shows she was trained in the ACE-V method. (Doc. 209-12, #1193). And the description she provided in her testimony as to her methodology tracks the contours of the ACE-V method, if not the precise terminology, as it is described in other cases. Accordingly, the Court finds that Horning reliably applied her expertise to the palm-print analysis at issue. Of course, Moore maintains his ability to challenge her findings at trial. *United States v. Jacobs*,

No. 2:21-cr-53, 2022 WL 1624609, at *7 (S.D. Ohio May 23, 2022) ("Any potential fallibility in [palm-]print identification is a matter for cross-examination, not a bar to admissibility.").

In sum, Horning is qualified; palm-print matching using ACE-V is a reliable method that Horning reliably applied here; and Horning's testimony on palm-print matching would assist the jury in deciding whether it is indeed Moore's hand depicted in the photograph. Thus, her testimony linking Moore to the photograph passes muster under *Daubert*.

## B. Moore's Objections to the Underlying Photograph at Issue May Require the Exclusion of Horning's Testimony.

But there is a second question—whether the photograph should come in at all. Moore argues that the photograph Horning used for her analysis—which was taken from his cellphone and depicts a hand holding what appears to be a bag of drugs—is inadmissible for several reasons. First, he says the photograph was created over a year prior to the conduct alleged in the indictment (indicating a lack of a temporal connection to that conduct). Second, he says the substance in the photograph is unidentified (and as a result may unfairly prejudice the jury). Third, he says that, because the photograph is related only to uncharged conduct, it amounts to prior bad acts evidence. The Court does not presently have sufficient information to resolve those arguments.

Moore's arguments implicate both Rule 403 and 404. Rule 403 allows courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, [and] misleading the jury" among

18

other reasons. Fed. R. Evid. 403. Rule 404(b), meanwhile, precludes "[e]vidence of any other crime, wrong, or act" used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

At the *Daubert* hearing, the government responded to these objections by arguing that it intends to use the photograph to show Moore's intent to distribute controlled substances and also to prove Moore had control over the substances the government found during the search of an apartment (and thus the opportunity to distribute them). As to the latter, it argues, for example, that the packaging depicted in the photograph is similar to the packaging used on the recovered drugs. True enough, such uses would fall within various of the exceptions that Rule 404(b)(2) carves out of Rule 404(b)(1)'s general prohibition on prior bad acts evidence. But, while the government invokes those exceptions, it has yet to provide sufficient detail for the Court to assess whether the government has properly done so. The current situation, for example, seems quite distinct from cases where courts have admitted similar evidence for background purposes. *See United States v. Wilson*, 837 F. App'x 396, 399 (citations omitted) (cleaned up) (explaining that "[p]roper background evidence … has a causal, temporal or spatial connection with the charged offense, or arises from the same event as the charged offense"). And the photograph itself seems unremarkable in terms of having a distinct capacity to identify drugs unique to those found in Moore's apartment—it simply depicts a hand holding a plastic baggie with an unidentified substance inside. The government needs to explain in more detail

19

how this picture, which includes an undisclosed substance in a non-descript plastic bag, and was taken a year before the charged conduct, relates to the crimes it alleges here. For example, the government could provide evidence that the photograph was taken at one of the locations at issue. Or it could identify some other unique element not immediately apparent to the Court. But for now, the Court is unconvinced that the government has proffered a proper purpose.

Finally, the Court observes that the photograph and Officer Horning's testimony relating to it are inherently linked. If the Court finds the photograph inadmissible, it sees no reason for Officer Horning to testify. Horning's testimony is related only to connecting Moore to the photograph. The Court therefore defers ruling until trial whether to admit Officer Horning's testimony.

## CONCLUSION

For the above-stated reasons, the Court **GRANTS IN PART,** to the extent that the Court already held a *Daubert* hearing, and **DENIES IN PART**, to the extent Moore seeks to preliminarily exclude Officer Kimberly Horning's expert testimony, Defendants [sic] Renewed Motion for Daubert Hearing (Doc. 338). The Court **DEFERS ITS RULING UNTIL TRIAL** on whether it will admit Officer Horning's testimony after the parties have had opportunity to more fully argue their respective positions under Federal Rule of Evidence Rule 403 once the evidence is proffered.

**SO ORDERED.**

October 3, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**